**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 12, 2013**

# In the Court of Appeals of Georgia

A13A1417, A13A1418. WELLSTAR HEALTH SYSTEMS, INC.   DO - 074
     v. PAMELA ELAINE KEMP et al.; and HENRY D. GREEN,   DO - 075
     JR. et al. v. PAMELA ELAINE KEMP.

DOYLE, Presiding Judge.

Pamela Elaine Kemp, individually and on behalf of the estate of David Allen Kemp, filed the instant wrongful death action alleging that WellStar Health System, Inc. ("WellStar"), was liable for the death of her husband based on the negligence of its employees. Because of alleged witness tampering, the trial court disqualified WellStar's trial counsel Henry D. Green, co-counsel David A. Sapp, and their law firm, Green & Sapp, LLP (collectively "the Lawyers"), and struck WellStar's answer. Thereafter, the court entered default judgment against WellStar as to liability and held a trial on damages.

In Case No. A13A1417, WellStar appeals, arguing that the trial court erred by (1) striking its answer as a result of the lawyers' actions; (2) denying its motion to recuse; (3) excluding the testimony of its experts during the damages phase; (4) failing to grant a mistrial or to admonish Kemp's trial counsel pursuant to OCGA § 9-10-185; and (5) refusing to charge the jury on the burden of proof. In Case No. A13A1418, the Lawyers appeal, arguing that the trial court erred by (1) granting Kemp's motion to disqualify them; and (2) overruling the lawyers' motion to quash their depositions and production of their internal emails regarding Kemp. For the reasons set forth below, we affirm in part and reverse in part as to Case No. A13A1417 and we affirm as to Case No. A13A1418.

Viewed in favor of the verdict,[1] the evidence shows that in May 2011, Kemp filed a medical malpractice complaint alleging negligence claims related to the death of her husband after admission to WellStar Douglas Hospital for a broken foot and exacerbated chronic obstructive pulmonary disease; attached thereto was the required expert affidavit of Dr. William Stinnette.[2] Upon receiving a copy of the complaint,

---

[1] See *Almond v. McCranie*, 283 Ga. App. 887, 888 (643 SE2d 535) (2007).

[2] Kemp later filed Stinnette's first amended affidavit in response to WellStar's motion to dismiss.

Green, who had handed the case over to Sapp and who did not make an entry of appearance as counsel, contacted Stinnette's employer, Northside Hospital, which is not a WellStar facility, and spoke to Northside's Vice President of Legal Services, Susan Sommers, with whom Green had a lengthy professional relationship, regarding Stinnette's involvement in the case.

Based upon Green's discussion with Sommers, the Lawyers believed that Stinnette would not be testifying on behalf of Kemp; however, by March 2012, it became apparent that Stinnette would indeed be testifying. After discussing deposition dates for Stinnette with Kemp's attorney, Green & Sapp associate Austin Gillis emailed Green to alert him to the fact that Kemp was representing that Stinnette "still" intended to testify on behalf of Kemp despite Green's previous conversation and apparent assurances from Sommers that Stinnette would not "be a factor."

The parties initially scheduled Stinnette's deposition for April 19, 2012, and Kemp's amended complaint along with Stinnette's second amended affidavit was filed on April 16, 2012. Gillis again emailed Green on April 13, asking him to contact Sommers and alert her to the fact that Stinnette's deposition was going to take place "after all" and asked Green to let her know about the testimony.

3

Thereafter, on April 16, three days prior to Stinnette's deposition, Green telephoned Sommers to discuss Stinnette's continued involvement in the case, and Sommers understood from Green that he was unhappy about Stinnette's involvement. Sommers then told Stinnette that a WellStar representative had telephoned her very upset that Stinnette would be testifying and did not want him to act as an expert in the case; Sommers referred to Stinnette's contract with Northside, and based on her statements and the tone of her voice, Stinnette believed his employment to be in jeopardy. Stinnette became upset after speaking with Sommers, and he requested that Kemp's trial counsel postpone his deposition because he was concerned his testimony might impact his employment. Thereafter, at approximately 4:00 a.m., on the morning of April 20, 2012, Stinnette, in a "distraught" telephone call to Kemp's counsel, explained that based on the conversations with Sommers and all that had transpired, he could not continue as Kemp's expert because he felt he might lose everything.

Meanwhile, on April 17, 2012, Kemp's counsel contacted the trial court to request a hearing on the lawyers' actions toward Stinnette, contending to the court that the actions constituted interference with a witness. In response to Kemp, on April 18, 2012, Sapp responded to the court and Kemp in a letter, the contents of which he discussed with Green and Sommers prior to submitting it to the court, stating that

4

[o]nce it became apparent that Dr. Stinnette was going to be providing sworn testimony against WellStar rather than simply executing an OCGA § 9-11-9.1 affidavit, my partner[,] Henry Green[,] telephoned Susan Sommers, General Counsel for Northside Hospital. . . . Mr. Green understood that Ms. Sommers would most likely want to know that one of Northside Hospital's employed physicians was planning on providing expert testimony against a local hospital, and that is the reason he called her. . . . Mr. Green's call to Ms. Sommers was simply a professional courtesy. . . . [I]t is easy to see why a hospital's general counsel might not want a hospital-employed physician to testify as a plaintiff's expert against a local hospital in a medical malpractice case. . . . Any question as to whether a hospital-employed physician should offer expert testimony on behalf of a plaintiff in a medical malpractice action is between a hospital's general counsel and the hospital's employees.

Consequently, Kemp moved to disqualify the Lawyers for tampering with her expert witness and moved to strike WellStar's answer. Kemp also noticed Green, Sapp, and Sommers for depositions and filed a motion to produce documents related to discussions with Sommers related to Stinnette, and in response, the Lawyers filed a motion to quash. After a hearing on the motion to quash, the trial court denied the motion to quash, allowing Kemp to depose Sapp and Green on the limited subject of the statements made in Sapp's April 18 letter to the court, and ruling that the court would make an in camera review of any documents prior to providing them to Kemp.

5

On July 5, 2012, after a hearing, the trial court entered a written order disqualifying the Lawyers as WellStar's counsel, finding that the Lawyers deliberately interfered with an expert witness by contacting Sommers in order for her to pressure Stinnette into withdrawing from the case.[3]

Thereafter, WellStar filed three affidavits from WellStar's risk management department, averring that although they had direct involvement with the case, they did not authorize the Lawyers' actions with regard to Stinnette and were not consulted about any calls made to Sommers. After a hearing to address the motion to strike WellStar's answer as a result of the Lawyers' actions regarding Stinnette, the trial court entered an order on September 5, 2012, granting the motion. The trial court found that despite WellStar's affidavits to the contrary, striking WellStar's answer was appropriate given that the attempts to prevent Stinnette from testifying were repeated and intentional, and the intimidation of Kemp's key expert witness, known to be such by WellStar for over a year, constituted a egregious injury to Kemp's case at that stage of litigation. Based on the sanction, the trial court entered default judgment in favor of Kemp and set the trial to determine damages. On October 3,

---

[3] Although the trial court granted a certificate of immediate review, neither the Lawyers nor WellStar applied to this Court for interlocutory appeal.

6

2012, prior to the damages trial, WellStar filed a motion to recuse or disqualify the trial judge, which the trial court denied.

At the conclusion of the damages trial, the jury returned a verdict for $681,875 on Kemp's wrongful death claim and $37,000 on Kemp's loss of consortium claim. These appeals followed, and because the trial court's decisions regarding WellStar flow from its determinations regarding the Lawyers' actions regarding Stinnette, we address the Lawyers' appeal first.

### Case No. A13A1418

1. The Lawyers contend that the trial court erred by granting Kemp's motion to disqualify counsel and to strike WellStar's answer based on the Lawyers' actions.

(a) As an initial matter, Kemp has filed a motion to dismiss the Lawyers' appeal, contending that the Lawyers lack standing to challenge the trial court's ruling disqualifying them.

Based on this Court's decision in *Ford Motor Co. v. Young*,[4] we find that the Lawyers do have standing to challenge their disqualification. In *Ford*, the trial court revoked two attorneys' pro hac vice admissions to the Superior Court after the attorneys had made erroneous admissions to the court concerning the defendant's

_____

[4] 322 Ga. App. 348 (745 SE2d 299) (2013).

liability insurance.[5] This Court first addressed the attorneys' standing to challenge the order revoking their admissions, and we determined that "[g]enerally, only a party to a civil case, or one who has sought to become a party as by way of intervention and has been denied the right to do so, can appeal from a judgment. However, where judgment is entered against a nonparty, that nonparty becomes a party with standing to appeal."[6] We further explained that the trial court's "findings may have continuing, adverse collateral consequences for the attorneys' careers" and therefore "they [were] directly aggrieved by the decision" and could appeal the revocation order.[7]

Here, in the same vein, the order disqualifying the Lawyers from representing WellStar contains findings that may have continuing adverse consequences because the trial court determined that the Lawyers intentionally interfered with an expert witness and that the Lawyers were evasive, contradictory, and not credible as witnesses before the court. Accordingly, Kemp's motion to dismiss Case No. A13A1418 is denied.

(b) Having so determined our jurisdiction, we turn to the disqualification itself.

---

[5] See id. at 351.

[6] (Punctuation omitted.) Id. at 352 (1) (a).

[7] Id.

8

Pursuant to OCGA § 15-1-3 (4),

> [e]very court has power to control, in furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto. This language is broad. The use of the word "all" as related to the persons to be affected, the use of the expression connected with a judicial proceeding, instead of some more restricted phrase, such as parties to the case, and the addition of the language, in every matter appertaining thereto, all seem to indicate an intention to declare a plenary power in the courts to exercise, over officers, parties, witnesses, and all others who may become connected in any way with a case pending before the court, such control as shall be adequate to carry out its full jurisdiction to administer legal justice in the case. [8]

Nevertheless,

> [t]he right to counsel is an important interest[,] which requires that any curtailment of the client's right to counsel of choice be approached with great caution. In determining whether to disqualify counsel, the trial court should consider the particular facts of the case, balancing the need to ensure ethical conduct on the part of lawyers against the litigant's

---

[8] (Punctuation omitted.) *Crosby v. Potts*, 8 Ga. App. 463, 467 (69 SE2d 582) (1910).

9

right to freely chosen counsel. We review the court's ruling for abuse of discretion.[9]

"[C]ourts have shown considerable reluctance to disqualify attorneys despite misgivings about an attorney's conduct . . . probably [because the] disqualification has an immediate adverse effect on the client by separating him from counsel of his choice," such motions are often interposed for tactical reasons, and even if "made in the best of faith, such motions inevitably cause delay."[10] "Unless an attorney's conduct tends to taint the underlying trial, the court should be quite hesitant to disqualify him."[11]

> Pursuant to Rule 3.3 of the Georgia Rules of Professional Conduct,
>
> [a] lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client; . . . (4) offer evidence that the lawyer knows to be false.

---

[9] (Punctuation omitted). *Clough v. Richelo*, 274 Ga. App. 129, 132 (1) (616 SE2d 888) (2005), quoting *Martinez v. Housing Auth. of DeKalb County*, 264 Ga. App. 282, 288 (5) (590 SE2d 245) (2003).

[10] (Citation and punctuation omitted.) *Reece v. Ga. Power Co.*, 191 Ga. App. 125, 127 (2) (381 SE2d 110) (1998), superceded by statute as stated in *Bernocchi v. Forcucci*, 279 Ga. 460, 462 (2) (614 SE2d 775) (2005).

[11] (Punctuation omitted.) *Reece*, 191 Ga. App. at 127 (2).

10

If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

Moreover, pursuant to Rule 3.4,

A lawyer shall not: . . . unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act; . . . [nor shall a lawyer] request a person other than a client to refrain from voluntarily giving relevant information to another party . . . ."

Finally, pursuant to OCGA § 16-10-93 (a),

A person who, with intent to deter a witness from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, communicates, directly or indirectly, to such witness any threat of injury or damage to the person, property, or employment of the witness or to the person, property, or employment of any relative or associate of the witness or who offers or delivers any benefit, reward, or consideration to such witness or to a relative or associate of the witness shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

Here, the trial court reviewed the evidence and found that the Lawyers repeatedly and intentionally contacted Sommers at Northside Hospital with the objective of interfering with Stinnette's appearance as Kemp's expert witness. The

11

trial court's order points to various discrepancies among the testimonies of Green, Sapp, and Sommers; the statements contained in Sapp's letter to the court stating that the purpose of Green's April 16 call to Sommers was to inform her that Stinnette was testifying; the statements contained in the Lawyers' various internal emails regarding the attempts to pressure Stinnette through Sommers; and Sommers's statement that Green's phone call consisted of him voicing displeasure about Stinnette despite Green's testimony that the call was simply to gather information about Stinnette. The court thoroughly explained how it arrived at its findings, including discrepancies, witness demeanor, and contrary testimony upon which its credibility determinations were based. Accordingly, we find no abuse of discretion.

The Lawyers contend that any actions on their part that led to Stinnette's decision to withdraw as an expert witness were not unethical or impermissible because Northside's contract with Stinnette prohibited him from testifying as expert witnesses on behalf of medical malpractice claimants. In this case, pretermitting whether Northside's employment contract prohibiting expert testimony by its doctors is legal or ethical, and pretermitting whether Sommers's discussions with Stinnette were impermissible, we find no abuse of discretion on the part of the trial court in determining that the Lawyers' acts of repeatedly contacting Northside through

Sommers, which was not a client involved in this case, in order to pressure Stinnette to withdraw from testifying was unethical behavior; that such behavior was intentionally committed in order to prevent such testimony, and that after such behavior was questioned before the trial court, Green and Sapp lacked candor in their testimonies on the subject.

The Lawyers also contend that the trial court's disqualification was erroneous because they did not directly contact Stinnette or directly threaten his employment based on his testimony for Kemp.[12] We find instructive the case of *Sanderson v. Boddie-Noell Enterprises, Inc.*,[13] in which the United States District Court for the Eastern District of Virginia reviewed a similar situation: therein, the plaintiff's

---

[12] We note that Stinnette and Sommers both testified that the two discussed Stinnette's involvement in the Kemp case in late May or June of 2011. Sommers's recollection of the events was that she contacted Stinnette after receiving a voice mail from Kemp's attorney asking for approval for Stinnette's participation. Stinnette remembered, with far more detail, that he approached Sommers after having signed the expert affidavit in the Kemp case to discuss the addendum to his employment contract related to expert testimony. He testified that the conversation ended with his agreement not to testify in other cases about which he had been approached, but that he would continue to (and that Sommers understood he would continue to) appear as an expert in the Kemp case. In any event, Stinnette's contract with Northside and his attempt to have his testimony pre-cleared is not relevant to the determination of whether the Lawyers engaged in sanctionable conduct.

[13] 227 FRD 448 (E.D. Vir. 2005) (memorandum order).

13

attorney contacted the employer of a noticed expert witness for the defense and alerted the employer to the expert's intent to testify in the case and such testimony's violation of the employer's contract with the expert. The district court found that this conduct was a violation of a provision of the Virginia Rules of Professional Conduct similar to Georgia Rule 3.4, explaining that the attorney could not so pressure an expert not to testify, even if the pressure was applied indirectly through the employer holding the applicable contract. The district court concluded that

> [a]s a direct and reasonably foreseeable consequence of that communication, [the employer] prohibited [the expert] from testifying, notwithstanding that [the expert] previously had testified over a dozen times while [employed there]. Thus, [plaintiff's attorney] deliberately set into motion a series of events that had the effect of obstructing the defendant's ability to use the services of its designated expert witness. Whether he intended that result is not dispositive of the issue because [the plaintiff's attorney] is chargeable with knowledge of the reasonably foreseeable consequences of the acts in which he deliberately engaged.[14]

As in *Sanderson*, the natural and foreseeable result of Green's phone calls was to have Stinnette pressured into withdrawing from the case.[15]

---

[14] Id. at 453-454 (A).

[15] See id.

Finally, the Lawyers contend that Kemp's own attorney may have contacted Sommers at the beginning of litigation in order to receive an approval from Northside for Stinnette to testify. Nevertheless, it does not follow that the Lawyers' contact with Sommers was acceptable. Whatever Northside's initial understanding of Stinnette's decision to testify may have been, the Lawyers had a duty to refrain from pressuring Stinnette directly or indirectly when they discovered that he intended to testify as an expert for Kemp. [16]

2. The Lawyers contend that the trial court erred by overruling their motions to quash their depositions and Kemp's motion to produce filed in relation to Kemp's motion to disqualify the Lawyers. We disagree.

In conjunction with the motions to disqualify counsel and to strike WellStar's answer, Kemp subpoenaed Green and Sapp for deposition and filed a motion for production of documents related to the alleged interference with Stinnette. Thereafter, the Lawyers filed a motion to quash the subpoenas asserting the work-product doctrine; the trial court denied the motion after a hearing thereon. In its order denying

---

[16] See Ga. Rule 3.4. See also OCGA § 16-10-93 (a). See also *Clos v. Pugia*, 204 Ga. App. 843, 844-845 (1) (420 SE2d 774) (1992); OCGA § 15-1-3 (4) ("Every court has the power . . . [t]o control, in the furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto").

the motion to quash, the court limited the Lawyers' depositions to the information contained in the April 18 letter written by Sapp regarding Green's conversations with Sommers about Stinnette's testimony, and the court made itself available during the depositions to decide any issues related to the scope of the depositions. Moreover, in order to prevent production of any items containing work product, the trial court conducted an in camera review of the documents the Lawyers submitted in response to the motion to produce.

> OCGA § 9-11-26 (b) (3) generally prohibits the compelled disclosure of materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative unless the party seeking their disclosure shows (1) that it has a substantial need for the materials to prepare its case and (2) that it is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Even if the requisite showing is made to compel disclosure under this standard, absolute protection is still afforded to mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. Where otherwise discoverable materials contain such mental impressions, the trial court may need to conduct an in camera review to ensure those portions are redacted prior to production.[17]

---

[17] (Citations and punctuation omitted.) *St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C.*, 293 Ga. 419, 429-430 (2) (746 SE2d 98) (2013).

16

"The work-product doctrine directly protects the adversarial system by allowing attorneys to prepare cases without concern that their work will be used against their clients,"[18] but " at least in some circumstances, a lawyer's unprofessional behavior may vitiate the work product privilege."[19]

> The integrity of the adversary process is not furthered by protecting a lawyer who steps outside his role as 'an officer of the court . . . work[ing] for the advancement of justice while faithfully protecting the rightful interests of his clients.' An attorney should not be able to exploit the privilege for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent ends."[20]

Here, the Lawyers had discoverable facts relevant to the disqualification issue that were not protected by work product or other privilege. The trial court properly conducted in camera review of the documents produced and properly limited the

---

[18] *McKesson HBOC, Inc.*, 254 Ga. App. 500, 503 (1) (562 SE2d 809) (2002).

[19] *Moody v. I.R.S.*, 654 F2d 795, 800 (II) (D.C. Cir. 1981). Because Georgia's Civil Practice Act is modeled on the Federal Rules of Civil Procedure, decisions of the federal courts interpreting the federal rules are persuasive authority. See *Ambler v. Archer*, 230 Ga. 281, 287 (1) (196 SE2d 858) (1973). Cf. *St. Simons Waterfront, LLC*, 293 Ga. at 429-430 ("Georgia law recognizes an exception to the attorney-client privilege for communications in furtherance of a crime, fraud, or other unlawful end.").

[20] *Moody*, 654 F2d at 800 (II).

17

scope of the depositions to the issue of the lawyers' conduct related to Stinnette, and therefore, we cannot say that the trial court abused its discretion by denying the motion to quash as to Sapp's and Green's depositions or motion to produce.

Accordingly, the trial court's order in A13A1418 is affirmed, and Kemp's motion to dismiss is denied.

*Case No. A13A1417*

4. WellStar contends that the trial court erred by striking its answer and entering a default judgment.

> At the outset, we note that rulings on motions to strike and for entry of default judgment are reviewed by this Court using an abuse of discretion standard. Indeed, a trial judge has broad discretion in the enforcement of the discovery provisions of the Civil Practice Act, and we will not interfere with the exercise of that discretion absent clear abuse. Nevertheless, dismissal and default are the harshest sanctions available for the trial court to impose, and we have cautioned against the use of these harsher sanctions except in extreme cases.[21]

> To determine whether the trial court abused its discretion in this case, we look to . . . : (1) whether the party seeking sanctions was prejudiced as a result of the destruction of . . . evidence; (2) whether the

---

[21] (Footnotes and punctuation omitted.) *Cameron v. Miles*, 311 Ga. App. 753, 754-755 (1) (716 SE2d 831) (2011). See also

18

prejudice could be cured; (3) the practical importance of the evidence; (4) whether the party who destroyed the evidence acted in good or bad faith; and (5) the potential for abuse if [the answer was not struck.][22]

Pretermitting whether the Lawyers acted at the direction of WellStar when they made calls to Stinnette's employer in an effort to prevent him from testifying on behalf of Kemp or whether it was necessary to make such a finding,[23] based on the spoliation factors outlined above,[24] the trial court abused its discretion by striking WellStar's answer as a result of that conduct. "[W]hen key evidence has been destroyed, exclusion of evidence or dismissal of a case may be warranted."[25] Here, however, the evidence related to David Kemp's death remains intact. We are mindful that the trial court's finding of an intentional, unethical act is well supported by the

---

[22] (Punctuation omitted.) *R.A. Siegel Co. v. Bowen*, 246 Ga. App. 177, 180 (2) (539 SE2d 873) (2000), quoting *Chapman v. Auto Owners Ins. Co.*, 220 Ga. App. 539, 542 (469 SE2d 783) (1996).

[23] See *R.A. Siegel Co.*, 246 Ga. App. at 180-181 (2) (defendant's insurer allowed destruction of evidence, which destruction was chargeable to the defendants). See also OCGA § 15-1-3 (A trial court has the power to control the behavior of those appearing before it to ensure its ability to conduct a fair trial.).

[24] *Chapman*, 220 Ga. App. at 542.

[25] *Bridgestone/Firestone N. Am. Tire, LLC v. Campbell*, 258 Ga. App. 767, 768 (574 SE2d 923) (2002).

19

record, and we are also mindful that as the trial court recognized, it is a hardship to Kemp to secure another expert in support of his case and that the expert's testimony is central thereto, but these hardships can be addressed by the trial court with a number of less severe sanctions than the complete foreclosure of WellStar's defenses to liability.[26]

Accordingly, we reverse the order striking WellStar's answer and entering default and remand for reconsideration of the sanctions to be imposed as a result of the abuse.

5. WellStar contends that the trial court erred by denying its motion to recuse based on the trial judge's statements related to the case at a continuing legal education class during pendency of the case. We disagree.

After the order striking WellStar's answer and granting default to Kemp was entered on September 6, 2012, the trial judge spoke at a panel discussion on ethics and professionalism at a family law seminar sponsored by the Institute of Continuing Legal Education of Georgia. At the seminar, which occurred on September 14, the judge was asked about the case and made various comments related to the order disqualifying the Lawyers and the order striking WellStar's answer based on the

[26] See, e.g., *R.A. Siegel Co.*, 246 Ga. App. at 179-180 (2).

20

Lawyers' actions. On October 3, 2012, WellStar filed a motion to recuse based on the trial judge's statements at the CLE.

In the affidavit, WellStar's new attorney attached an affidavit stating that "I was informed that [the judge] spoke as part of a presentation . . . which took place on September 14, 2012." He also stated that he "made arrangements to obtain a copy of the videotape of the [CLE], which I received on September 28, 2012." The affidavit failed to state precisely when WellStar's representatives first learned of the Judge's comments that may have given rise to disqualification. The trial court denied the motion.

Uniform Superior Court Rule ("USCR") 25.1 provides that: "[a]ll motions to recuse . . . shall be timely filed in writing and . . . [f]iling and presentation to the judge shall be not later than five (5) days after the affiant first learned of the alleged grounds for disqualification . . . unless good cause be shown for failure to meet such time requirements."[27] "Deciding whether the motion is timely, whether the affidavit

---

[27] See also *Mills v. State*, 187 Ga. App. 79 (1) (369 SE2d 283) (1988).

21

is legally sufficient, and whether the facts asserted authorize recusal . . . present questions of law, for which the appropriate standard of review is de novo."[28]

Here, the motion to recuse was filed more than five days after Wellstar learned that comments had been made by the judge at the CLE.[29] Thus, for the motion to be considered timely, WellStar had to show good cause for failing to meet the five-day filing requirements. WellStar's affidavit did not demonstrate when it first learned of the comments or what it understood about the comments that would give rise to recusal. Therefore, the affidavit was legally insufficient to determine whether the motion was timely filed or whether WellStar had good cause to file outside that five day time period.[30]

---

[28] *Mayor & Alderman of the City of Savannah v. Batson-Cook, Co.*, 291 Ga. 114 119, (1) (728 SE2d 189) (2012).

[29] While Wellstar's counsel never states specifically the date they learned that the comments had been made, it was of necessity some time before September 28, 2012, the date they received the copy of the panel discussion.

[30] See *Threatt v. State*, 211 Ga. App. 630 (440 SE2d 61) (1994), overruled on other grounds by *Atlanta Independent School Sys. v. Lane*, 266 Ga. 657, 658 (1) (469 SE2d 22) (1996). See also *Mills*, 187 Ga. App. at 79 (1) (movant knew of comments on March 5 but did not file motion until March 18 with no showing of good cause for delay).

WellStar argues that the five day period should run from September 28, 2012, which was the date it received a copy of the panel discussion.[31] In *Threatt v. State*,[32] however, this Court rejected a similar argument that the USCR 25.1 five-day-requirement runs from the date of obtaining a transcript containing the comments at issue.[33] Because there is no requirement that the supporting affidavit recite verbatim comments, as long as the substantive or factual basis was made clear, WellStar had a duty to file the motion within five days of when it first learned of the substance of the comments, but WellStar failed to provide this information in its affidavit.[34] Accordingly, we affirm the trial court's denial of the motion to recuse.

6. We do not reach WellStar's remaining enumerations of error because they are not likely to recur on retrial.

---

[31] WellStar cites to *Batson-Cook*, 291 Ga. at 114, in support of its contention that the motion was not untimely, however, the question presented was "whether the factual allegations presented on the motion to recuse were legally sufficient to require the motion to be presented to another judge for decision." Moreover, in that case, the information was not known to the party until the receipt of the letter from opposing counsel. *Batson-Cook*, 291 Ga. at 120 (2) (a).

[32] 211 Ga. App. at 630. See also *Echols v. Echols*, 281 Ga. 546 (640 SE2d 257) (2007).

[33] *Threatt*, 211 Ga. App. at 630.

[34] See id.

For the above reasons, the judgment for appellee is reversed and a new trial on liability and damages is ordered but the order denying the motion to recuse is affirmed.

*Judgment affirmed in part and reversed in part in Case No. A13A1417. Judgment affirmed in Case No. A13A1418. McFadden and Boggs, JJ., concur.*